Good morning, Your Honor. I will spend my first five minutes. Would you please introduce yourself for the record? My first name is spelled O-L-U-M-I-D-E. My last name is O-B-A-Y-E-M-I. It's pronounced Obayemi, just like Obama. Mr. Obayemi, very well. Your Honor, I will spend my first five minutes, and then I will save five minutes for rebuttal. Your Honor, this case has three issues. The first issue is as to whether the petitioner has stated a case that has a nexus to the protected grounds under the Immigration and Nationality Act. The second issue is whether there are adequate basis for finding that the petitioner is not credible. I believe, Your Honor, that the last issue is as to whether the punishment that was meted out to the petitioner in Ethiopia qualifies as a persecution. As to the first issue, whether there is a nexus, Your Honor, it is stated in many parts of this case that the petitioner was persecuted on account of imputed political opinion as well as his race. What is the imputed political opinion? Because what he actually says is that, you know, his medical ethics, his sense of ethics, differed from the resource allocation philosophy that his superiors had. So why would D.I.J. and the BIA be compelled to find that it was on account of ethnicity or on account of the views of a group that he wasn't a member of? Your Honor, as it has been held in this circuit, in the case of Sanger, S-A-N-G-H-A, the issue is not the actual opinion held by the petitioner. It is what the persecutor imputes on the petitioner, whether right or wrong. If a person deems, if as this man who is of Amara ethnicity, and the ruling tribe is a Tigrayan, the Tigrayan believed that when Mr. Adichio tried to save the people in the Amara region, he was advocating for the political interest of the Amara. They said you are anti-government. You are anti-ERPDF, which is the ruling government at that time. So, Your Honor, the issue is not whether Mr. Adichio actually held or was a part of the appeal. I understand that. Yes. What I'm looking for is evidence in the record that would compel the BIA to find otherwise. Yes. Your Honor, in the record we have several references to race, Your Honor. For example, at page, I believe, at page 129 of the record, an officer from the prime minister, I believe, from the prime minister's office, actually met Mr. Adichio and accused him and said, he told me, he told me, that I'm quoting from line 12 to 15, he said, in addition to that, what he said in addition to that, he told me that while I'm a government employee, that I am promoting the idea or the policy or the mission of Amara organization. And the next question, was that what you were doing? I was not promoting that. I was not actively participating. However, as an Amara person, yes, I do support them. I do support their ideas. But I was not doing anything to promote any of their missions. Your Honor, what is born out in this fact and other parts of the record, is that the issue of Amara's ethnicity was, and the issue of the goals held by the Amara organization was a central issue that motivated the prosecution in this case. And, Your Honor, as well, as we have stated in the brief, the, the, this, unfortunately, in this case, the Amara ethnicity is closely intertwined with the political opinion. That is why it is very tenuous in trying to distinguish both in this case. Your Honor, I would save my last five minutes. You may do so, counsel. We'll hear from the BIA. May it please the Court. Mark Pennick of the U.S. Department of Justice. I represent the Attorney General in this proceeding. The result in this case is compelled by the standard of review, and that is that there is no evidence in this case that would compel this Court to reverse the BIA's decision here that, one, it wasn't beaten at all. The petitioner was not. And, two, in any case, whatever mistreatment he may have suffered was not on account of a protected ground, a ground for which the Congress had decided. What evidence supports the fact that he wasn't beaten at all? The I.J. said and held that he did not believe that he was mistreated. The BIA on page 2 and page 3 of the, of the record. That he did not believe? What was the evidence? I mean, if you accepted his testimony as true, he testified that he was detained and beaten. So what's the evidence that he wasn't? The evidence that the I.J. found persuasive was, in fact, that he was, the government allowed him, the petitioner, to engage in three international travels taking place at each of the alleged beatings. Which he explained were at the invitation of the World Health Organization and that the government really had no choice. And then the I.J. speculated that. The I.J. found that inherently implausible. Well, you're right. Right. Based on what? Based upon his understanding of how this is to work. What is that? What does he know about the World Health Organization? Exactly. I mean, there is a, there's a common sense element to the I.J.'s ruling and the BIA's ruling. But it doesn't really matter, does it? Or you could characterize it as speculative. I don't think it was. I think it's a fair inference based on common sense. But in any event, it doesn't matter. Because the idea here that there was, in fact, the beatings or the discipline was based upon a protected ground is at the heart of the I.J.'s and indeed the BIA's ruling here. He was disciplined, if he was disciplined at all, for rank insubordination. The BIA held that that is not political opinion. That holding is entitled to deference. Political opinion is entitled to be construed by the board in the first instance in its scope. Indeed, this morning, and I wanted to bring this to the Court's attention because I just learned of it, the Supreme Court issued a new decision on that very subject. It's called Negussi v. Holder. The Supreme Court issued it this morning, you say? This morning, Your Honor. Oh, my. I just learned of it on Blackberry. Breaking news. It is breaking news. Negussi v. Holder, N-E-G-U-S-I-E, is 07-499, in which the Supreme Court reaffirmed once again that the BIA, and this is not new, was entitled to determine the meaning of the Immigration Act in the first instance. And indeed, the Immigration Act mistaken an interpretation that it was bound in a certain way by a prior precedent was, in fact, wrong, and then remanded the case for initial determination for that provision. And that was the prosecutor's bar for its element in that case. But the point on this is that it is reasonable for the BIA to hold that rank insubordination is not a protected ground. Well, I think that's probably true, that insubordination is a protected ground. But isn't it a factual question whether this was insubordination or because of where he came from in the country and his – he disagreed with the government policy of not publicizing plagues and diseases in parts of the country that the government was, I guess, against or trying to subordinate? Two points, Your Honor. First, of course, it's a fact of inquiry. And again, the evidence of record here –  No, no. Actually, it would go – take you into whether the evidence is – whether it's sufficient to compel the – Right. But that's not what this new Supreme Court case talks about. No. No. Okay. But the second point is, of course, the idea that a government employee may disregard a government instruction not to do this. The analogy, I think – Well, suppose you were in Nazi Germany and you disobeyed the instruction to kill a Jew. And that would be illegitimate, as this Court's case is told. Would that be political opinion or would that be insubordination? Yes, of course it would. That would be absolutely political opinion. And this Court's thesis – and we talk about this in our brief – draw the line between legitimate and illegitimate, between corruption, government policies that are basically corrupt or illegal or illegitimate, and those which are not. It is perfectly legitimate, the Board held in this case, for the government to exercise control over contact between a government employee and outside foreign organizations. As a general principle, that seems to me beyond dispute. Is it at least open to you or to the BIA or the IJ to understand that in certain countries that the government might just let a certain ethnicity, a portion of the population die? No, of course it's inconceivable, Your Honor. Isn't that happening all over the world? It may well be, but there's no evidence of that in this case. There isn't a record. No, there isn't, Your Honor. All we have here is the Petitioner's own assertions, which is contradicted by the State Department's report that says that, in fact, those ethnic minorities the Petitioner identifies are not discriminated against. That, in fact, dispute the evidence, the evidence that there was no Petitioner-on-Court, there was no meningitis vaccination, is disputed. Indeed, there's evidence that the IJ admitted that shows that, in fact, that vaccinations were distributed all over Ethiopia. There is no evidence here of a genocidal campaign against any ethnic minority. All we have here is basically a Petitioner who is a government employee saying, I want to contact, even though I'm not authorized to do so, outside organizations, on outbreaks of diseases where the government has told him, make do with existing resources. We are the ones who determine who we contact outside the government, not you. And that's a legitimate exercise of government power. I'll give you an example. If I were to go outside and hold a sign protesting government policies, that might be inferred, one could infer that I was of political opinion. And if I was prosecuted or persecuted on that ground, then you could draw the inference. But if I took that same sign, and I start breaking windows, and I killed a police officer, and I was prosecuted for that, then I would be prosecuted because I broke the windows and I killed the police officer. Now, does that hypothetical apply to this case? Yes, it does, because what we have here, if Petitioner was, in fact, simply a private citizen protesting the policies of his government with respect to vaccinations or whatever, then that may be one thing. But he wasn't. He was disciplined because he engaged in rank and subordination and disobeyed his political superior's instructions that we are the ones that contact these outside organizations, not you. We are the ones that determine how we're going to allocate scarce resources, not you. Your job is to do what we tell you to do. Harsh? For sure. But legitimate? Absolutely. And that's what the BIA held. And that's what is entitled to deference. I can see that my time is almost up. I'm going to quickly address the Catt claim. The degree of persecution here is disputed. The IJ and the BIA said we don't believe he's persecuted at all, indeed, that he suffered any kind of beatings. We know for a fact from Petitioner's own testimony that after the first detention, he wasn't beaten at all. He wasn't even interrogated. He was simply held for three days and then released, and he went to work the next day. Then second detention, he says he was beaten, but for 15 minutes a night for four nights. Well, no scars, no injuries, no trauma. He went to work after recovering from an illness within a week. That's not torture. There was not a history of torture. And there is independent evidence in this case that shows that persons of his ethnicity are not persecuted upon return of Ethiopia. There is no threat. And again, as Petitioner must show by the ponderance of the evidence, it's more likely than not that he will be in fact tortured. He wasn't tortured in the past. There's no showing that he would be tortured again if he returned. This is, I submit, very easy on the Catt claim, because there's simply no basis for the clue that he was either tortured or faced torture. Now, this is, this case is pre-real ID. Correct, Your Honor. Now, is there a nuance there that we should be aware of? I identified that in the footnote. But I think the cases that we cited in our brief here also predate the real ID with respect to the way the credibility or the credibility determinations, factors that the I.J. may consider. And I think it really doesn't make much difference in this particular case whether the real ID applies or not. Because even before real ID, the I.J. and the BIA was entitled to make credibility determinations and use their common sense in doing so, which is precisely what they've done here. I submit to the Court that the Court should affirm the BIA's determination and dismiss the petition. Thank you, Counsel. Thank you, Your Honor. Counsel, you have some reserved time. Yes, Your Honor. Your Honor, first of all, I will make reference quickly to the Nazi Germany analogy, Your Honor. In this case, in the second arrest, the issue that led to the second arrest of the petitioner, 2,100 people had died in the Ampara region. There was loss of life. In the case of Tagaga, T-A-G-A-G-A, in which this Court sustained that a person could disobey an illegal or illegitimate order of a government, that was only a case that bothered with stealing of funds. But in this case, before the petitioner was arrested, 2,100 people had died. There was loss of life. So if loss of life would not compel a conscientious doctor to disobey an order of a government, Your Honor, I cannot see what else would marry that. Counsel, your government attorney says there's nothing in the record that supports that there was this loss of life due to disease in place. Your Honor, at the... Yes, Your Honor. I believe between pages 133 to 145 of the...page 133 to 145 of the administrative record, Your Honor, I will look for that as I'm talking. Yes. There was mention that was about 21 other people had lost their lives in this case. And while I'm looking for that, Your Honor, I want to direct the Court's attention to page 309 of the administrative record. That is the country report. At the very last paragraph, that record states that in Ethiopia, at that time, there was evident that the prison conditions were poor, that the security forces committed extrajudicial killings by beating and mistreating detainees. Your Honor, and then there were arbitrary arrest, detention, prolonged pretrial detention, as long as...and many other incidences of atrocities. Further, at page 312, this document talks elaborately on the fact that there were torture and other cruel, inhuman, and degrading treatment happening in Ethiopia at that time. Further, Your Honor, at page 328, this document mentions that there were serious racial and ethnic clashes leading to deaths in Ethiopia. So, Your Honor, when all these statements are taken in context, this would show that in Ethiopia, the people who were not in government were suffering from...were persecuted by the ruling government because there was ethnic mutual distrust. And this is brought to know by the recent case of this NYSERDA, which is S-I-N-H-A against S-I-N-H-A. And in this case, the court mentioned that where there is a longstanding racial tension, ethnic tension in a country, that would contribute to a finding of unaccountable. As this court mentioned, this is a pre-real ID act. As it was said in this case of SINHA, S-I-N-H-A. The standard in the pre-real ID act is that so long as the prisoner can show that his attackers were motivated, at least in part, by a protected gun, that is sufficient to establish that the action was on account of a protected gun within the meaning of the Immigration and Nationality Act. Your Honor, I'm still referring the court again to...like I said, it's between page one, three, two. Yes, Your Honor. Yes. At page one, three, five. That is between line seven and eight. By January 2001, the day's number exceeded 150. The people who were ill over 2001, by that time, 2,100. Your Honor, so this is the point. As of this time, I'm pointing...this doesn't say they are dead, Your Honor, but at page one, three, five, line seven to eight, by the time the prisoner was arrested, 2,100 people were suffering from the incident. That was... Thank you. Counsel, your time has expired. Thank you, Your Honor. Counsel, before you...first of all, the case just argued will be submitted for decision. But, Counsel, while you were here, I had a question about your 28J letter. You know, we do have a limitation on the number of words that can be put in a 28J letter. You elected not to file a reply brief, but you filed a 28J letter with at least 2,500 words in it. And I just wondered, did you have an explanation for why you didn't follow the rule? Your Honor, I think that was an oversight on my part. I'm sorry? I think that was an oversight on my part. Oversight. Yes, but I believe most of the facts that were illustrated were already in the opening brief already. If we take that out, I believe probably the rest would be within... All right. But I would just counsel you to please be aware, and to all counsel in the audience today, be aware of our rules, because we they're there for a purpose and we do expect them to be observed. Thank you, Your Honor. Thank you, Counsel. We will hear now argument in the next case, which is MIL Liquidation Inc. v. Westfall.
judges: O'scannlain, Rymer, Wardlaw